UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**DIANE K.,**

**Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:21-cv-01058-TPK

OPINION AND ORDER

## OPINION AND ORDER

    Plaintiff filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security. That final decision, issued by the Appeals Council on July 28, 2021, denied Plaintiff's application for disability insurance benefits. Plaintiff has now moved for judgment on the pleadings (Doc. 15) and the Commissioner has filed a similar motion (Doc. 16). For the following reasons, the Court will **GRANT** Plaintiff's motion for judgment on the pleadings, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

### I. BACKGROUND

    Plaintiff filed her application for benefits on May 8, 2019, alleging that she became disabled on March 3, 2016. After initial administrative denials of that claim, a hearing was held before an Administrative Law Judge on November 6, 2020. Plaintiff and a vocational expert, Steven Sachs, both testified at the hearing.

    The Administrative Law Judge issued an unfavorable decision on January 29, 2021. He first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021, and that she had not engaged in substantial gainful activity since her alleged onset date. Next, the ALJ concluded that Plaintiff suffered from severe impairments including cervical and lumbar herniated discs and migraine headaches.. However, the ALJ determined that these impairments, taken singly or in combination, did not meet the criteria for disability under the Listing of Impairments.

    Moving forward with the sequential evaluation process, the ALJ then concluded that Plaintiff had the ability to perform a limited range of light work. She could never use ladders, ropes, or scaffolds or work at a job that involved more than hourly use of ramps or stairs. She could also do simple one-step and two-step tasks, but she could not perform complex work, endure any change in the work setting or tasks during a workday, or have any contact with the

public. She could, however, tolerate occasional contact with supervisors and coworkers. Lastly, she had to avoid a work environment involving more than 70 decibels of noise.

Next, the ALJ determined that, with these limitations, Plaintiff could not do her past relevant work as a bookkeeper, salesperson, waitress, or supervisor of census workers. However, based on the testimony of the vocational expert, the ALJ concluded that Plaintiff could perform unskilled light jobs like hand packer, collection worker, and production inspector. As a result, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff, in her motion for judgment on the pleadings, raises three claims of error. First, she asserts that the ALJ improperly found that her traumatic brain injury and chronic adjustment disorder with depression and anxiety were not severe disorders. Second, she argues that the ALJ improperly based his determination of her mental limitations on his lay opinion. Third, she claims that the ALJ's assessment of her social limitations was flawed.

## II. THE KEY EVIDENCE

### A. Hearing Testimony

The Court begins its review of the evidence by summarizing the testimony given at the administrative hearing.

Plaintiff first testified that on March 3, 2016, her vehicle was rear-ended while stopped at a red light. She suffered a concussion which was later diagnosed as a brain injury. She also hurt her lower back. The accident caused her to lose her short-term memory temporarily, and, on a more ongoing basis, affected her stamina, comprehension, and cognition. She also suffered from migraine headaches and blurred vision and had difficulty in busy environments. At the time of the hearing, she was working eight or ten hours per week and earning $300 to $500 per month.

Further describing her headaches, Plaintiff said that she had constant headaches but migraines only once or twice per week. Those episodes could last for six to eight hours and could result from her having had to concentrate the previous day. She also experienced difficulty multi-tasking and had exercise intolerance, meaning that increased exercise affected her cognitive functioning. Plaintiff also identified limits on her ability to stand and walk and said that she was required to break tasks up into small segments so she could get through them.

Plaintiff also testified that she lived by herself and was able to cook and to drive. Her condition had gotten better since the accident and she was able to do some exercises as part of her physical therapy, but that was still limited.

The vocational expert, Dr. Sachs, first identified Plaintiff's past jobs as either light or sedentary. He was then asked questions about a person with Plaintiff's vocational profile who could do light work but had limitations concerning the use of ramps, stairs, ladders, ropes, and

scaffolds, and who was limited to performing simple tasks in a quiet and static work environment without any public contact and with only occasional contact with others in the workplace.  He responded that such a person could not do any of Plaintiff's past jobs, but could work as a hand packer, production worker, or production inspector.  Those jobs could be done at either the light or sedentary exertional levels.  He also gave numbers for the light jobs as they existed in the national economy.  Finally, Dr. Sachs testified that being off task for more than ten percent of the time would not be tolerated, nor would being absent from or late to work more than eight days a year.

### B.  Medical Evidence

Pertinent medical records show the following.  As Plaintiff testified, she was in a motor vehicle accident on March 3, 2016.  She was subsequently seen by Dr. McVige at Buffalo Therapy Services for issues concerning her speech and cognition.  As of August of that year, her symptoms included problems with her neck and back, dizziness, headaches, and poor recall and processing skills.  Examination findings included deficits in attention, short-term memory, complex auditory processing, reading comprehension, executive function, and cognitive endurance.  A six-month course of therapy was recommended.  A treatment note from January, 2017 showed that she had been referred to Dr. Englert, a clinical neuropsychologist, by Dr. McVige.  Plaintiff reported slow improvement in her symptoms but still had trouble focusing in a noisy environment and experienced some signs of anxiety.  Testing showed that she was functioning at a high average level in global cognitive functioning and intellectual functioning but a low average level in processing, with notable weaknesses in attention and organizational planning. Dr. Englert believed that some of Plaintiff's cognitive difficulties stemmed from the pain and headaches she experienced as a result of her physical injuries. After that evaluation, Plaintiff continued with her course of therapy, with notes showing generally that she had issues with attention and executive functioning.

Treatment notes also show that she was being followed for her neck and back injuries.  As of September, 2017, she reported mild neck pain and moderate back pain despite various therapies.  MRI results showed disc herniations in the neck and back.  Plaintiff was treated by massage and chiropractic manipulation as well as trigger point injections and nerve blocks.

Dr. McVige saw Plaintiff for a re-evaluation in 2019.  The notes show that Plaintiff had suffered a TIA in 2018 but that she did have an improvement in her symptoms since the accident, although she continued to have good and bad days and suffered from "brain fog" from overexertion.  She also had daily headaches which affected her ability to concentrate and perform usual daily activities.  The diagnoses at that time included intractable chronic post-traumatic headache, attention deficit disorder, and intractable migraine without aura.

### C.  Opinion Evidence

Dr. Englert, the neuropsychologist, concluded, on the basis of her testing, that Plaintiff had attention and concentration difficulties.  She thought Plaintiff would benefit from breaking

down large tasks into smaller segments, keeping track of her progress on those tasks, working only in 20-minute segments in a distraction-free workplace, and explaining things to herself out loud. (Tr. 315-22).

Plaintiff underwent a psychiatric evaluation on August 30, 2019, performed by Dr. Fabiano, a consultative psychologist. At that time, she had been going to mental health counseling once a month since her accident. Her symptoms included difficulty sleeping, weight gain, depressed mood, and anxiety. On examination, her attention and concentration were grossly intact but her recent and remote memory skills were mildly impaired. Dr. Fabiano concluded that Plaintiff was mildly impaired in her ability to deal with simple directions and instructions and moderately impaired with respect to complex instructions and in relating to others. She had no limitations in maintaining attention and concentration or performing at a consistent pace. (Tr. 1011-15).

A neurological consultative examination was also performed that day. The examiner, Dr. Liu, noted that Plaintiff reported chronic neck and back pain as well as migraine headaches once or twice per week. She had some limitation in the range of motion of her cervical and lumbar spines. Dr. Liu concluded that Plaintiff had mild limitations in her ability to walk, bend, squat, lift, carry, reach overhead, sit for a long time, stand, and climb stairs. She also might experience interruptions due to her migraine headaches. (Tr. 1017-21).

Karen Bunce, a licensed speech pathologist, completed a mental impairment questionnaire on November 4, 2020, indicating that she had been treating Plaintiff since the accident. She did not think Plaintiff could work full-time due to headaches, neck pain, and vision issues which were all made worse by sustained attention and concentration. She also could not work in a noisy environment and she would need more than the usual number of work breaks, including being off-task up to 20% of the time. She also could not attend work reliably if she had to work five days a week on an ongoing basis. (Tr. 1229-30).

State agency reviewers also expressed opinions about Plaintiff's functional capacity. Dr. Koenig concluded on September 11, 2019, that Plaintiff could do light work with occasional stooping and the need to avoid concentrated exposure to noise and all exposure to hazards. (Tr. 101-03). That assessment was concurred in by Dr. Baronos. (Tr. 120-22). Dr. Dekeon, a psychologist, did not think that Plaintiff had any severe psychological impairments. (Tr. 118).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence,

considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

## IV.  DISCUSSION

### A.  Severe Impairments

As her first claim of error, Plaintiff asserts that the ALJ committed a two-pronged error by both failing to find that her traumatic brain injury and chronic adjustment disorder were severe impairments, and also not taking into account the limitations caused by those disorders. In support of this argument, she cites to numerous studies which showed objective changes in her brain and also to the diagnosis of traumatic brain injury by Dr. McVige, a neurologist, as well as statements from Ms. Bunce indicating functional limitations caused by that disorder.  She also notes that both Dr. Fabiano, the consultative examiner, and Dr. Englert diagnosed her with chronic depression and anxiety, and that Dr. Fabiano identified moderate limitations in various areas of work-related functioning, indicating that those impairments met the low threshold for severity under the Act.  She requests a remand in order for the ALJ to correct this alleged error. The Commissioner responds that the ALJ elected, reasonably, to treat Plaintiff's combination of mental impairments as a whole without determining the severity or non-severity of each one, and that he did take the limitations arising from those impairments into account when making his residual functional capacity evaluation, meaning that any error made at step two of the analysis was harmless.

As this Court has observed,

At the second step of the sequential evaluation, the ALJ must determine the

> severity of a claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381 (D. Conn. 2012). Impairments that are "not severe" must only be a slight abnormality that has a minimum effect on an individual's ability to perform basic work activities. *Id*. When assessing a plaintiff's RFC [], the ALJ is required to consider "all of plaintiff's medically determinable impairments of which [the ALJ was] aware, including [plaintiff's] medically determinable impairments that are not 'severe'." 20 CFR § 416.954. Thus, courts have held that an ALJ's failure to classify an impairment as severe is harmless error, provided the ALJ determines that at least one of the claimant's impairments is severe, and then continues with the remaining steps of the analysis.

*Stover v. Saul*, 2020 WL 897411, at *8 (W.D.N.Y. Feb. 25, 2020).

Here, the ALJ specifically stated that he "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." (Tr. 13). He also said that he "considered the claimant's mental symptoms and the effect on her functioning together, regardless of the diagnostic label attached." *Id*. He then conducted the severity analysis for mental impairments, concluding that Plaintiff had only a mild limitation in the area of understanding, remembering, and applying information, no limitation in the area of interacting with others, a mild limitation in the area of concentrating, persisting, or maintaining pace, and a mild limitation in the area of adapting or managing oneself. (Tr. 13-15). Under the applicable regulation (20 C.F.R. §404.1520a), those findings dictate a conclusion that any mental impairment is not severe. Despite this conclusion, however, the ALJ did incorporate mental limitations into his residual functional capacity finding, limiting Plaintiff to the performance of simple tasks in a static work environment and limiting her contact with the public and with others in the workplace. Since it is clear that the ALJ did, as he said, consider what impact Plaintiff's mental impairments had on her ability to function in the workplace, the question becomes simply whether his conclusion that Plaintiff had only those mental limitations, and no others, is supported by substantial evidence in the record. This is the issue raised by Plaintiff's next two claims of error, so the Court will now analyze those claims.

### B. Substantial Evidence

Plaintiff makes a number of arguments about whether the ALJ's decision is supported by substantial evidence. They include (1) that the ALJ did not properly credit opinion evidence from Ms. Bunce and Dr. Englert that Plaintiff would be off-task more than would be tolerated by an employer; (2) that the ALJ reached his mental residual functional capacity determination by interpreting the raw medical data based on his own lay opinion; and (3) the ALJ did not explain why he differentiated Plaintiff's ability to relate to others when he concluded that she could occasionally relate to others in the workplace but never deal with the general public. The Court will address each of these contentions in turn.

With respect to the opinion evidence, the ALJ found Ms. Bunce's opinion somewhat persuasive. In particular, he credited her views that Plaintiff could do simple, routine work in a quiet environment, but found that her opinion was internally inconsistent concerning how well Plaintiff could tolerate work stress and was also inconsistent with treatment notes showing that Plaintiff was progressing in her ability to demonstrate endurance and to accomplish complex tasks. (Tr. 23). As to mental limitations, the ALJ found that Dr. Fabiano's opinion was persuasive (although the ALJ said that it showed only mild limitations in functioning, whereas Dr. Fabiano also identified various areas where Plaintiff was moderately limited), and he also credited the opinions of the state agency reviewers. The ALJ did not, as Plaintiff correctly points out, discuss Dr. Englert's opinion at all in that section of his decision, nor did he include Dr. Englert's report or findings in his summary of the evidence. Plaintiff argues that the failure to analyze Dr. Englert's opinion is a *per se* violation of 20 C.F.R. §404.1520c and that this failure, standing alone, supports a remand for further proceedings. On the other hand, the Commissioner contends that Dr. Englert's statement is not actually a medical opinion and that the ALJ would, had he addressed it, have rejected it for the same reasons underlying his rejection of portions of Ms. Bunce's opinion.

The Court is troubled by the ALJ's total failure to acknowledge or discuss Dr. Englert's report. As noted above, that report was generated in January of 2017 when Plaintiff's treating doctor, Dr. McVige, referred Plaintiff to Dr. Englert for a neuropsychological evaluation. Dr. Englert examined Plaintiff on two separate occasions and took an extensive history of Plaintiff's mental functioning following the accident. Plaintiff was described as having made a good effort during testing but showing some anxiety, especially on more challenging tasks. She scored in the borderline range on an attention test and showed impairment in sensory-motor functioning and complex figure testing. Dr. Englert rated Plaintiff's anxiety level as "severe." Her impressions included attention and concentration deficits and deficits in intellectual functioning. Dr. Englert believed that some of Plaintiff's attention and concentration difficulties stemmed from her headaches and chronic pain caused by the accident, and she thought Plaintiff would benefit from breaking down large tasks into smaller segments, keeping track of her progress on tasks, working only in 20-minute segments, working in a distraction-free workplace, and explaining things to herself out loud. (Tr. 315-22).

It is too simplistic to characterize this evaluation and its conclusions as something other than a medical opinion. If the ALJ had viewed it as in any way ambiguous, he was free to ask for clarification, but simply ignoring it altogether constitutes error. Further, the error is not harmless. The reasons given for discounting Ms. Bunce's opinion (and she was not, of course, a neuropsychologist with special expertise in the area of traumatic brain injury) are unique to her findings. It simply cannot be inferred that the ALJ would have applied similar reasoning to Dr. Englert's report when it was based on an entirely different set of findings which, in turn, came from extensive cognitive testing. As this Court noted in *Sottasante v. Colvin*, 209 F. Supp. 3d 578, 594 (W.D.N.Y. 2016), when a physician's "statement is significantly more favorable to Plaintiff than other opinions in the record[,] [t]he ALJ's failure to address this opinion [i[s not harmless." That is the case here; the statement overlooked by the ALJ is more favorable to Plaintiff than the ones he relied on, and it is based on testing that the other sources did not do and

comes from a specialist in the area.  Consequently, the case will be remanded for further proceedings.  This conclusion largely moots Plaintiff's claim about the ALJ's use of his own lay judgment, since he will be required to conduct an additional analysis of the medical opinion evidence, and it will give the ALJ a chance to provide further explanation about his conclusions concerning Plaintiff's ability to deal with others should he choose to do so.

## V.  CONCLUSION AND ORDER

For the reasons stated above, the Court **GRANTS** Plaintiff's motion for judgment on the pleadings (Doc. 15), **DENIES** the Commissioner's motion (Doc. 16), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four. Commissioner.

**/s/ Terence P. Kemp**
**United States Magistrate Judge**